**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

ANDREA SUE DONNAN,

     Plaintiff,

v.

CATALYST REPOSITORY SYSTEMS, INC., a Delaware corporation,

     Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Andrea Sue Donnan for her Complaint states:

**<u>INTRODUCTION</u>**

1.     This is a sex discrimination suit brought by the former Chief Marketing Officer of Catalyst Repository Systems, Inc. ("Catalyst") who was discriminated and retaliated against and terminated from her employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").

**<u>PARTIES</u>**

2.     Plaintiff Andrea Sue Donnan (f/k/a Andrea Johnson) is a resident of the State of Colorado.

3.     Defendant Catalyst is a Delaware corporation that is authorized to do business in Colorado.

4.      Catalyst's principal office is located at 1860 Blake Street, Suite 700 in Denver, Colorado 80202.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 and specifically under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the employment practices alleged to be unlawful were committed in the District of Colorado.

7.      At all relevant times, Defendant Catalyst was covered by the definition of "employer" set forth in 42 U.S.C. § 2000e(b) of Title VII.

## SPECIFIC ALLEGATIONS

8.      Catalyst is engaged in the business of providing products and services to assist corporate and law firm clients with e-discovery.

9.      Donnan worked for Catalyst as the Chief Marketing Officer from October 13, 2014 until she was terminated on October 19, 2015.

10.      Donnan was recruited for the position by Lancor, an executive recruitment firm and was hired by Catalyst's board of directors and the company's Chief Executive Officer, John Tredennick.

11.      When Donnan was hired, she interviewed with board member Eric Byunn, who represented the capital investment firm that owned a majority stake in Catalyst.

12.     During this interview, Byunn and Donnan discussed that Donnan's job was to help increase Catalyst's revenues, as the company's growth had been stagnant for the last few years.

13.     Donnan accepted a compensation package that was heavily weighted with incentive pay for performance and stock options that vested over a four year period or when a major event occurred such as the sale of the company.

14.     As a result, Donnan expected that the majority of her earnings would come from the stock options and incentive pay.

15.     During her time at Catalyst, Donnan was the only woman on the Senior Management Team, all of whom reported to Tredennick.

16.     No other member of the Senior Executive Team was interviewed by Byunn prior to his hire.

17.     Throughout Donnan's employment, she noticed that Tredennick treated her differently than he treated the male members of the Senior Management Team.  For example, Tredennick:

     a.     was condescending and more critical of Donnan's performance than her male peers;

     b.     directed his criticism at Donnan personally rather than regarding the substance of her work by, for example, accusing her of not understanding something or not being capable of writing a proper assessment and marketing plan;

     c.     often made negative comments about Donnan's work to her male peers;

d.   demonstrated a lack of trust in Donnan's expertise and ability by refusing to review her work until she first submitted it to her colleague, Vice President of Sales, TJ Gill, for approval;

e.   befriended male members of the Senior Management Team, including by greeting them in the office, calling them, and inviting them out for lunch or dinner, while calling Donnan a total of three times during her year of employment, routinely ignoring her in the office, and never inviting her out for lunch or dinner;

f.   interfered with Donnan's ability to perform her job, including by failing to tell her about a discussion that took place at the April 2015 meeting of Catalyst's board, which Donnan was unable to attend, about increasing marketing to capitalize on current market conditions; and

g.   held Donnan to a higher standard than her peers.

18.   While Tredennick would openly criticize Donnan's ideas and work product, if Donnan asked her male colleagues, including editor Bob Ambrogi and graphic designer Nate Hall, to present her ideas and materials (such as website changes, press releases, public relations activity, and infographic materials) to Tredennick as their own work, Tredennick would respond with approval and commend them for a job well done.

19.   Tredennick treated other women in the same critical and condescending manner, including recommending demoting the only female member of the sales team to fix Catalyst's sales organization when she was not responsible for the issue and speaking poorly about

Catalyst's outside public relations consultant, Valerie Chan, despite the fact that she and her team had achieved good results for the company.

20.     In comparison, Tredennick has a history of retaining poor male performers, including the:

     a.   Vice President of Sales, TJ Gill, whose sales department was performing poorly;

     b.   Chief Financial Officer, Lewis Visscher, who failed to detect a multi-year embezzlement operation at the company that was ultimately discovered by the Human Resources manager, Erin Bird; and

     c.   Chief Technology Officer, Larry Barela, who failed to deliver products on time.

21.     When Donnan complained to female HR Manager Erin Bird that she felt that Tredennick was treating her worse than her male colleagues, Bird responded that she had similar experiences with Tredennick but took no actions in response to Donnan's complaint.

22.     Donnan complained about Tredennick to female Training Director Patty Daly, who also shared that she had experienced Tredennick's condescending attitude and advised Donnan to avoid involving Tredennick if she wanted to "get anything done."

23.     Despite this difficult work situation, Donnan made significant contributions to Catalyst, including achieving the best outcome in Catalyst's history at the major tradeshow of the year, winning best new product of the year, and increasing brand recognition for Catalyst through increased press coverage and a higher volume of sales leads.

24.     Throughout Donnan's employment, her continued improvements to Catalyst's marketing performance appeared in quarterly reports to Catalyst's board of directors.

25.     In May 2015, Donnan began to experience health issues related to the stress of her working environment, including severe debilitating migraines that required medical treatment.

26.     When Donnan brought her concerns to Tredennick about the difficulties with their working relationship in early June 2015, Tredennick responded by dismissing her concerns and accusing her of being "overly sensitive," "paranoid," and "emotionally charged."

27.     In a meeting with Catalyst board member Eric Byunn in July 2015, Donnan told Byunn about her June 2015 meeting with Tredennick, described the work environment at Catalyst as "toxic," and explained that the company could not achieve its growth potential if Tredennick continued to roadblock Donnan's work to effectively market the company's products.

28.     Although Byunn asked Donnan to keep him "informed," he failed to take any action in response to Donnan's concerns.

29.     Shortly after the July 2015 board meeting, Donnan complained again to Bird about Tredennick's poor treatment of her.  Bird agreed but did not take any action to rectify the situation.

30.     In response to the Catalyst's board's renewed request at the July 2015 board meeting for a plan to increase the amount of money invested in marketing expenditures, Donnan prepared three options and presented them to the board via phone in August 2015; the board selected the option – a digital marketing campaign – that Tredennick did not support.

31.     Despite the board's clear directive, Tredennick interfered with Donnan's ability to develop this marking campaign by, among other things, making clear that he did not "believe" in digital marketing, failing to approve any of Donnan's proposed materials that would fulfill the campaign, and criticizing her work.

32.     In the October 2015 board meeting, Tredennick refused to respond to the board's question regarding the status of the digital campaign.

33.     When Donnan responded diplomatically that the campaign development was in progress pending Tredennick's involvement and feedback, Byunn aggressively questioned and singled Donnan out in front of Catalyst's board and Tredennick.

34.     In a discussion with Byunn following the meeting, Donnan stated that she thought it was time for her to resign since she had been placed in an impossible situation: the Board had directed her to pursue the campaign but she was unable to do so without Tredennick's approval, which he continued to withhold.

35.     Byunn admitted that Tredennick was "challenging" but asked Donnan to reconsider her decision.

36.     On October 16, 2015, via e-mail, Tredennick requested a meeting with Donnan the following Monday morning, October 19.

37.     During the call with Donnan the morning of October 19, 2015, Tredennick stated that the employment relationship "just wasn't working out" and gave Donnan the following options: (1) termination for cause, (2) termination for "convenience," or (3) resignation, which would involve Donnan assisting in the transition of her work to her replacement in exchange for a two week severance.

38.    When Donnan requested time to discuss these options with her husband, Tredennick demanded that she get back to him as soon as possible because her replacement was scheduled to start the following day.

39.    When Donnan attempted to negotiate a severance package that was more in line with an executive of her experience in exchange for a release for all legal claims against the company, Tredennick said that he was "shocked" and stated that Donnan had no legal claims against the company.

40.    In response, Donnan encouraged Tredennick to speak with Bird about Donnan's counteroffer, as Donnan had spoken to Bird on several occasions about the hostile work environment.

41.    Later in the afternoon, before Donnan had the chance to select one of the three departure options, Tredennick terminated her.

42.    Tredennick then refused to pay Donnan $9,418.75 in accrued paid time off ("PTO") without "proof" that her PTO hours had been reported accurately.

43.    Tredennick accused Donnan of improperly underreporting PTO by claiming to be working while on vacation and citing her Facebook posts as evidence of this.

44.    In reality, Donnan frequently worked during holidays as most executives in the company did.

45.    In comparison, Donnan's male counterparts frequently underreported their PTO.

46.    As of the date of this Complaint, Catalyst has failed to pay Donnan her PTO.

47.    On October 20, 2015, Tredennick sent an e-mail to the company informing the entire staff that Donnan had been terminated and introducing her replacement, Bob Berger.

48.     Catalyst failed to send Donnan any documentation about her termination, including information about her COBRA benefits.

49.     On October 21, 2015, when Donnan took her daughter to a routine dental appointment, Donnan learned that Catalyst had terminated her and her family's health benefits on October 19.

50.     On February 3, 2016, Donnan filed charge of discrimination number 541-2016-00913 with the U.S. Equal Employment Opportunity Commission ("EEOC") in which she alleged that Catalyst discriminated against her based on her sex and retaliated against her in violation of Title VII.

51.     On March 31, 2017, the EEOC issued Donnan a notice of right to sue.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
(Sex Discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, against Defendant)

52.     The foregoing allegations are realleged and incorporated herein by reference.

53.     Catalyst subjected Donnan to different terms and conditions of her employment based on sex.  This treatment included, but is not limited to: treating Donnan in a condescending manner; more closely scrutinizing and criticizing her performance; directing criticism at her personally rather than the substance of her work; requiring her to submit her work to another male colleague before her supervisor would review it; interfering with her ability to perform her job; accusing her of being "overly sensitive," "paranoid," and "emotionally charged" when she complained about the work environment; failing to investigate or otherwise address her

complaints about sex discrimination; terminating her; replacing her with a man; dropping her insurance coverage without warning; and refusing to pay out her accrued PTO.

54.     Catalyst's actions toward Donnan were done knowingly and intentionally or with reckless disregard of her rights.

55.     Catalyst's conduct discriminated against Donnan on the basis of her sex in violation of Title VII.

56.     As a direct and proximate result of Catalyst's actions, Donnan has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## SECOND CLAIM FOR RELIEF
(Retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, against Defendant)

57.     The foregoing allegations are realleged and incorporated herein by reference.

58.     Donnan participated in statutorily protected activity by opposing practices targeted at her that were unlawful under Title VII, including discrimination based on sex.

59.     As a result of Donnan's protected opposition to discrimination, Catalyst retaliated against her by subjecting her to the different terms and conditions of employment as described in this Complaint, including: interfering with her ability to perform her job; accusing her of being "overly sensitive," "paranoid," and "emotionally charged" when she complained about the work environment; failing to investigate or otherwise address her complaints about sex discrimination; terminating her; dropping her insurance coverage without warning; and refusing to pay out her accrued PTO.

60.     Catalyst's conduct violated 42 U.S.C. § 2000e-3(a) of Title VII.

61.     As a direct and proximate result of Catalyst's actions, Donnan has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

WHEREFORE, Plaintiff Andrea Sue Donnan respectfully requests that this Court enter judgment in her favor and against Defendant Catalyst and order the following relief as allowed by law:

A.     Compensatory damages, including but not limited to those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life;

B.     Back pay and benefits;

C.     Injunctive and/or declaratory relief;

D.     Reinstatement or front pay and benefits;

E.     Punitive damages;

F.     Attorney fees and costs of the action, including expert witness fees, as appropriate;

G.     Pre-judgment and post-judgment interest at the highest lawful rate; and

H.     Such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted June 26, 2017.

By:   SWEENEY & BECHTOLD, LLC

s/Charlotte Sweeney
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: cnsweeney@sweeneybechtold.com

s/Ariel B. DeFazio
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: abdefazio@sweeneybechtold.com

ATTORNEYS FOR PLAINTIFF

Plaintiff's Address:
5936 Highland Hills Circle
Fort Collins, CO 80528

**CERTIFICATION OF GOOD STANDING**

I hereby certify that I am a member in good standing of the bar of this Court.


By:     SWEENEY & BECHTOLD, LLC

s/Charlotte Sweeney
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: cnsweeney@sweeneybechtold.com

s/Ariel B. DeFazio
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: abdefazio@sweeneybechtold.com

ATTORNEYS FOR PLAINTIFF